**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------- X
TIZIANA CACACE,                                         :
                                                        :
                        Plaintiff,                      :       Civil Action No.
                                                        :
              v.                                        :
                                                        :       **COMPLAINT**
OPTUM, INC., a subsidiary of UnitedHealth Group,        :
DENNIS FINE, ANDREW HAYEK and                           :
PROHEALTH MEDICAL MANAGEMENT, LLC,                      :       **Jury Trial Demanded**
d/b/a ProHEALTH Care, all in their individual and       :
professional capacities,                                :
                                                        :
                        Defendants.                     :
---------------------------------------------------------------- X

Plaintiff Tiziana Cacace ("Plaintiff"), by and through her undersigned counsel, Wigdor

LLP, hereby states and alleges as follows:

## PRELIMINARY STATEMENT

**Many women have been successful at breaking the glass ceiling only to find a layer of men.**
*- Jane Harman, former United States House of Representative*

1.      Until recently, Ms. Cacace was on the trajectory to become the Chief Operating

Officer ("COO") of ProHEALTH Medical Management, LLC d/b/a ProHEALTH Care

("ProHEALTH" or the "Company"), one of the largest private multi-specialty practices in the

Northeast that was acquired by Optum, Inc., a subsidiary of UnitedHealth Group.

2.      Ms. Cacace started working at ProHEALTH in 2006 as a Practice Administrator

and worked her way up to the position of Director of Clinical Applications and Operations, and

then Vice President ("VP") of Operations and Strategic Development within the Office of the

Chief Executive Office ("CEO").

3.      In April 2018, Ms. Cacace was told by ProHEALTH's CEO that she would be

promoted to COO following the departure of the existing COO.

4.      However, Ms. Cacace's promotion never came to fruition after Optum placed Dennis Fine at ProHEALTH where he usurped Ms. Cacace's responsibilities, treated Ms. Cacace and other female executives in a disrespectful and abusive manner, had a sexual harassment complaint made against him and expressed blatantly discriminatory views about the sexual orientation and age of existing and prospective employees.

5.      Ms. Cacace's and ProHEALTH's CEO's complaints to Optum about Mr. Fine's abusive treatment of female executives and discriminatory attitudes fell on deaf ears.

6.      In August 2018, Mr. Fine was named COO of ProHEALTH over Ms. Cacace without any legitimate explanation as to why she was passed over for the position.

7.      Mr. Fine's abusive treatment of Ms. Cacace only worsened once he became COO. Ms. Cacace tried to discuss with Mr. Fine his negative treatment of her, but Mr. Fine made clear that he knew she had made complaints about him and that nothing was going to change.

8.      Mr. Fine promptly hired a new VP of Operations, Edward Hay, whom Mr. Fine met at an Advisory Board Conference earlier that year.  Mr. Fine relayed to Ms. Cacace and others that he knew Mr. Hay was "the guy" he wanted at ProHEALTH when he initially met him.

9.      Mr. Fine further instructed Ms. Cacace to show Mr. Hay everything she knew, refused to delineate her responsibilities from Mr. Hay and excluded her from critical operations meetings.

10.     Simply put, after dedicating over a decade of her career to ProHEALTH, and on the precipice of becoming the COO of one of the largest medical providers in the Northeast, Ms. Cacace had the door to her future at ProHEALTH slammed in her face by a chauvinistic and misogynistic male executive.

11.     Ms. Cacace is emotionally devastated by the abrupt change in the course of her career at ProHEALTH, and was forced to take FMLA leave to seek medical treatment to address the recurrent and severe panic attacks she began experiencing as a result of Mr. Fine's actions, and the refusal of Optum executives to take any corrective actions.

12.     To make matters worse, ProHEALTH quickly hired a recruiter to find a new Vice President of Operations to replace Ms. Cacace, and before Ms. Cacace could return from FMLA leave, she received a letter terminating her employment.

13.     The only reason given for her termination was "ongoing changes" to the organization and the termination letter makes no mention of the fact that Ms. Cacace was on FMLA leave at the time.

14.     Unfortunately, Ms. Cacace is not alone in her experience at ProHEALTH, as she is among several other female executives at ProHEALTH who has suffered discriminatory and retaliatory conduct since Mr. Fine's arrival at ProHEALTH.

## NATURE OF THE CLAIMS

15.     This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress unlawful employment practices committed by Defendants against Ms. Cacace, including Defendants' discrimination and retaliation in violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL").

## JURISDICTION AND VENUE

16.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under 29 U.S.C. § 2601 *et seq*.

17.     This Court has supplemental subject matter jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE REMEDIES

19.     Contemporaneous with the filing of this Complaint, Plaintiff will file a charge of discrimination and retaliation arising out of the facts described herein with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  When the EEOC issues Ms. Cacace's notice of right to sue, she will seek leave to amend this Complaint to add claims for Defendants' violations of Title VII.

20.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

21.     Plaintiff Tiziana Cacace was the Vice President of Operations and Strategic Development for Defendant ProHEALTH Medical Management, LLC and works at ProHEALTH's headquarters in Lake Success, NY.  At all relevant times, Ms. Cacace met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

22.     Defendant Optum, Inc. is a limited liability corporation, licensed to do business in the State of New York, with its headquarters located at 11000 Optum Circle, Eden Prairie, MN 55344.  Optum, Inc. is a subsidiary of UnitedHealth Group.  In 2014, Optum and/or UnitedHealth Group acquired 80% of the equity in ProHEALTH, but at that time made agreements to keep the existing management in place to operate the Company.  At all relevant times, Optum, Inc. met the definition of "employer," "person" and/or is subject to aider and abettor liability under the NYSHRL.

4

23. Defendant Dennis Fine is a Senior Vice President of Operations at Optum, Inc. and currently serves as the Chief Operating Officer at ProHEALTH's headquarters in Lake Success, NY. At all relevant times, Mr. Fine met the definition of "employer," "covered employer," "person" and/or is subject to aider and abettor liability under the FMLA and NYSHRL.

24. Defendant Andrew Hayek is the CEO of OptumHealth, a division of Optum, Inc. Upon information and belief, Mr. Hayek works out of Optum's headquarters in Eden Prairie, MN, has the authority to hire and fire executives at ProHEALTH and has control over such executives' job duties. At all relevant times, Mr. Hayek met the definition of "employer," "person" and/or is subject to aider and abettor liability under the NYSHRL.

25. Defendant ProHEALTH Management, LLC d/b/a ProHEALTH Care ("ProHEALTH" or the "Company") is a limited liability corporation, licensed to do business in the State of New York, with its headquarters located at 1 Dakota Drive, Suite 320 Lake Success, NY 11042. At all relevant times Defendant ProHEALTH had more than 50 employees within a 75 mile radius of Ms. Cacace's worksite, and therefore at all relevant times met the definition of "employer," and "covered employer" under the FMLA and NYSHRL.

## FACTUAL ALLEGATIONS

### Background

26. In 2006, Ms. Cacace started working at ProHEALTH as a Practice Administrator, after obtaining her Bachelor's degree in Health Care and Public Administration and working as a medical operations manager for five years.

27. In her role as Practice Administrator, Ms. Cacace supported and helped manage the finance and operations of seven Ambulatory Practice divisions, developed special projects

for sub-specialty groups and assisted with the direct management of 20 physicians and 50 staff members.

28.     In 2009, Ms. Cacace was promoted to Director of Clinical Applications and Operations.  In that position, Ms. Cacace managed the clinical and administrative operations systems used within the provider organizations, was responsible for strategic planning, budgetary oversight and the development and implementation of clinical and administrative applications.

29.     Ms. Cacace's contributions to ProHEALTH in that position included maximizing office operations by creating standards for administrative and clinical patient access, triage and other processes, improving the scope of services, patient flow, access, and medical records, and expanding the management team and support staff to ensure effective, efficient medical offices.

30.     Ms. Cacace also successfully built and deployed the organization's first Electronic Medical Record Application, and did so while building a complete implementation and programming team that still supports the effort today.

31.     In 2013, as a result of her successful contributions and commitment to ProHEALTH, Ms. Cacace was promoted to Vice President ("VP") of Operations and Strategic Development within the Office of the Chief Executive Officer ("CEO").

32.     In the last five years, Ms. Cacace has helped grow, manage and provide leadership to ProHEALTH's now more than 300 practices in New York that generate $600 million in annual revenue.

33.     Among other responsibilities, Ms. Cacace has created strategic operating plans for administrative divisions, developed a team of Directors and Regional Managers, improved practice efficiencies and helped develop some of the Company's most important initiatives and strategic plans, including, but not limited to, New York State's first Proton Therapy Center.

**Ms. Cacace is Slated to Become COO**

34.     In March 2018, Dr. David Cooper, founder and then-CEO of ProHEALTH, informed Ms. Cacace that her supervisor Walter LeStrange, the Company's then-COO would be leaving in the next month.  Dr. Cooper told Ms. Cacace that he intended to make Ms. Cacace the new COO and already informed Optum leadership of the promotion decision.

35.     Dr. Cooper acknowledged that Ms. Cacace had already assumed many of Mr. LeStrange's responsibilities and that she had proven herself capable of handling the position.

36.     On April 9, 2018, Mr. LeStrange officially left ProHEALTH and Ms. Cacace assumed all of his departments, including Radiology, Laboratory and the Proton Center.

37.     However, that same week Dr. Cooper informed Ms. Cacace that Optum was making plans to come to ProHEALTH to meet with everyone to review the current leadership structure, and that he would need to wait a few months before he could officially announce her position as COO.

38.     Ms. Cacace did not believe that there were any issues with her promotion to COO, because at that time ProHEALTH also needed to select a new Chief Medical Officer ("CMO"), as the former CMO, Anthony Ardito, had his title removed due to numerous complaints about his sexual relationship with a Licensed Practical Nurse ("LPN"), including that Dr. Ardito was sleeping with the LPN at the office and taking Viagra from the office without a prescription.

**Optum Places Dennis Fine at ProHEALTH in an Advisory Capacity**

39.     On May 4, 2018, Andrew Hayek, OptumHealth's CEO and Angela Knight, Vice President of Revenue Cycle, held a meeting with ProHEALTH's senior management.

40.     Mr. Hayek also brought with him Dennis Fine, a white male, who was presented as an Optum resource that would be temporarily stationed at ProHEALTH for three to six months to help the current leadership team.

41.     After the meeting, Mr. Hayek pulled Ms. Cacace aside for a one-on-one meeting, at which point he told Ms. Cacace that Mr. Fine was not there to replace her, but there to work with her to put together a strategy and plan so that she could continue to do her job as successfully as she had in the past.

42.     On May 7, 2018, Mr. Fine started working at ProHEALTH.

43.     The next day, an email was sent to the entire organization announcing Mr. Fine as a Senior VP of Operations for Optum who would be overseeing the various departments that Ms. Cacace was responsible for, and working alongside Ms. Cacace and her colleagues.

44.     Following this email, Dr. Cooper reiterated to Ms. Cacace that the plan was still to promote her to COO.

45.     Although Mr. Fine was supposed to work collaboratively with Ms. Cacace, Mr. Fine's conduct made it clear that he had no intention of doing so because she was a woman.

46.     In the days following his arrival, Mr. Fine only briefly spoke with Ms. Cacace and made no real effort to understand her role and responsibilities.

47.     Instead of setting up a comprehensive meeting with Ms. Cacace to learn about her responsibilities and ProHEALTH's operations, Mr. Fine scheduled bi-weekly meetings with Ms. Cacace that were supposed to last an hour, but over time got progressively shorter and shorter.

48.     When Mr. Fine did interact with Ms. Cacace, he spoke to Ms. Cacace in a demeaning and condescending manner that was noticeably different than how he treated and interacted with the male executives and employees at ProHEALTH.

49.     Mr. Fine also surreptitiously met with the staff and doctors that Ms. Cacace worked with and instructed them to communicate with him directly.

50.     In addition to his contemptuous treatment of Ms. Cacace, Mr. Fine also displayed his blatantly discriminatory attitudes toward older and LGBT employees.

51.     During one conversation with Ms. Cacace and a group of regional managers, Mr. Fine explicitly instructed to them to "**weed out the older doctors**" so they could be replaced.

52.     During another meeting among executive leadership, Ms. Cacace raised her concern that Dr. Shahkroh Abiri, CEO of BayRidge Medical Imaging, who stayed with ProHEALTH after it was acquired in September 2017, was discriminating against women because he declined to even interview four qualified female candidates for a Director of Radiology position.

53.     Ms. Cacace explained that she only had two more candidates to present before she would have to renew the recruitment process.

54.     When someone at the meeting asked whether the remaining two candidates were women, Mr. Fine interjected, "**No, but they are all gay**" and laughed – implying that this was worse than being a woman.

55.     Ms. Cacace's belief that Dr. Abiri was discriminating against women was not unfounded, and in fact based on her personal interactions with him.

56.     When Ms. Cacace started working with Dr. Abiri around April 2018, Dr. Abiri would tell Ms. Cacace that she "dressed pretty" and was nice to have in meetings.

57.     However, during meetings Dr. Abiri refused to make eye contact with Ms. Cacace and would consult and make decisions with James Alvarez, Vice President of Business Development, even though Ms. Cacace was responsible for his group.

58.     Earlier this year, Ms. Cacace also had to pull a female Regional Manager, Jackie Barry, from working with Dr. Abiri because she complained that he hated women and was constantly attacking her and speaking to her in a disrespectful manner while treating male employees professionally.

**Ms. Cacace Complains about Mr. Fine's Discriminatory Conduct**

59.     In May 2018, after dealing with Mr. Fine's negative treatment and discriminatory comments, Ms. Cacace complained to Dr. Cooper about Mr. Fine, including that Mr. Fine made the aforementioned offensive and discriminatory comments.

60.     Ms. Cacace also relayed that she felt uncomfortable working with Mr. Fine because she felt he made it a point to be abrasive, demeaning, and condescending towards her and other female executives.

61.     Dr. Cooper in turn reported Mr. Fine's conduct to Mr. Hayek and Travis Winkey, Executive Vice President, Corporate Development.

62.     Specifically, Dr. Cooper relayed that Mr. Fine was trying to minimize Ms. Cacace's job, that Mr. Fine was misogynistic and that they could not have Mr. Fine working with Ms. Cacace once she filled the role of COO, which Optum still refused to give the green light to.

63.     Dr. Cooper also relayed that Dr. Fine made a derogatory comment about Jews, which offended Dr. Cooper who is Jewish.

64.     After the conversation, Dr. Cooper spoke with Ms. Cacace and expressed his frustration with the fact that Optum would not let him make her COO, and commented that other than her being a woman, there would be no reason not to give her the position.

**An Employee Files a Sexual Harassment Complaint against Mr. Fine**

65.     The following week, Megan Lee, an administrative assistant, filed a sexual harassment complaint with Human Resources against Mr. Fine.

66.     Ms. Lee was sitting at her desk with her lunch money out on the desk, and in front of Dr. Cooper and others, Mr. Fine asked her if he should start peeling off his clothes now.

67.     Shortly thereafter, Ms. Lee resigned and during her exit interview told Lauren Hallam, Senior Director of Human Resources, that Mr. Fine made her feel uncomfortable, and complained about his retaliation and discrimination.

68.     As a result of Ms. Lee's complaint, Lisa Helling, Optum's Senior Vice President, Human Capital, visited ProHEALTH to investigate.

69.     During the investigation, Ms. Cacace met with Ms. Helling and relayed Mr. Fine's differential treatment of her and gender-based marginalization.

70.     Specifically, Ms. Cacace relayed that she felt Mr. Fine was unfairly targeting her and yelling at her without reason, while he would go out to dinners and drinks with the male employees and treated them in a professional manner – even if there was a performance issue.

71.     Ms. Cacace also expressed to Ms. Helling that Mr. Fine was trying to force her out of the company so he could hire a male for her position, and that the only reason why she was not given the COO position already was because she was a woman and not perceived to fit in with the rest of the male leadership.

72.     Despite the serious nature of Ms. Cacace's complaint to Ms. Helling, Ms. Cacace never heard anything further from Ms. Helling.

73.     Instead, in the following months, Mr. Fine continued to degrade and attack Ms. Cacace during meetings.

74.     Mr. Fine also obstructed Ms. Cacace's attempts to hire candidates to fill open positions, and then held Ms. Cacace responsible for the duties that would have been assigned to that position.

75.     Mr. Fine's advice to Ms. Cacace was similarly hostile, often telling her to "**fucking get it resolved**."

76.     In addition, Ms. Cacace was excluded from all decision making concerning the Radiology department, and therefore unofficially removed from her responsibilities.

77.     Instead, Mr. Fine, along with Alec Stout (a male employee) and Dr. Abiri would make departmental decisions among themselves, often during dinner or drinks from which Ms. Cacace was excluded.

78.     Mr. Fine's sexist and discriminatory conduct is clearly driving other female employees from the Company.

79.     Cristina Kerrigan, Regional Manager, and Bernadine Citarella, Clinical Liaison, both left ProHEALTH in early September 2018 after submitting complaints about the toxic and hostile work environment created by Mr. Fine.

80.     As yet another example, Kim Gallub, the Vice President of Nursing, recently resigned and complained about Mr. Fine's conduct in her exit interview.

81.     Ms. Cacace also discussed Mr. Fine's treatment of her with other female executives, including Ms. Schroeter and Ms. Hallam – both of whom shared that they felt that Mr. Fine treated them in a disrespectful manner because of their gender.

**<u>Ms. Cacace is Passed Over for the COO Position</u>**

82.     In July 2018, Dr. Cooper announced that he would be transitioning out of his role as CEO, and that Optum would be purchasing his remaining ownership stake.

83.     Following this announcement, Dr. Cooper continued to assure Ms. Cacace that the plan was to make her COO, and commented again that there would be no reason for her to not be selected for COO position other than the fact that she is a woman, and was unfairly being assessed by Mr. Fine.

84.     On August 1, 2018, Dr. Cooper officially stepped down from his role at the Company, and Dr. Zeyad Baker was named CEO.

85.     Dr. Cooper informed Ms. Cacace that he had made Dr. Baker aware of the concerns he had with Mr. Fine and his behavior towards Ms. Cacace.

86.     Instead of Dr. Baker taking action to address the concerns about Dr. Fine, on August 5, 2018, Ms. Cacace received an email announcing that Mr. Fine would be the new COO.

87.     Blindsided by this news, Ms. Cacace emailed Dr. Baker to get confirmation that Mr. Fine was actually made the COO.

88.     In response, Dr. Baker claimed that it was planned for Mr. Fine to be COO when he first came to ProHEALTH, which directly contradicted what Mr. Hayak told Ms. Cacace when he placed Mr. Fine at ProHEALTH.

89.     Ms. Cacace also called Dr. Cooper about Mr. Fine becoming COO and confirmed with him that he was not brought to ProHEALTH to assume the COO position.

90.     Dr. Cooper further encouraged Ms. Cacace to seek legal counsel because he believed she was more suitable for the job than Mr. Fine, and the fact that she was not considered for the position, made Dr. Cooper believe that it had to do with her gender.

91.     In a separate conversation, Dr. Cooper told Ms. Cacace that he called Mr. Winkey and demanded to know what happened, and expressed that he thought there was something

wrong with Mr. Fine and complained about his conduct, including that he observed Mr. Fine verbally attack the female leadership at ProHEALTH.

92.     In addition, Dr. Cooper alluded to the fact that he was aware of some misconduct or allegations against Mr. Fine at a prior employer related to discrimination or harassment, and he questioned why Optum would place someone with that history at ProHEALTH.

**Mr. Fine Retaliates Against Ms. Cacace**

93.     On August 6, 2018, there were several leadership meetings involving Ms. Cacace and Mr. Fine.  During several of these meetings, Mr. Fine noticeably criticized and dismissed the work that Ms. Cacace performed.

94.     After the meetings, Ms. Cacace met with Dr. Baker about Mr. Fine's treatment of her.  Dr. Baker said that he could tell after just two meetings that Mr. Fine "clearly treats [her] differently" and that it was not appropriate.

95.     Dr. Baker assured her that he would speak to Mr. Fine about his behavior.

96.     However, either Dr. Baker did not speak with Mr. Fine or the talk was ineffective, as Mr. Fine's treatment of Ms. Cacace only worsened.

97.     For instance, during one of Ms. Cacace's presentations, Mr. Fine commented loudly that Ms. Cacace was not "**fucking owning anything**."

98.     Likewise, on August 18, 2018, a Sunday, Ms. Cacace received a condescending email from Mr. Fine unreasonably demanding an immediate weekly update for radiology charges.

99.     Ms. Cacace shared this email with Dr. Baker as another example of Mr. Fine's inappropriate treatment of her.

100.    Dr. Baker said that Mr. Fine's email was inappropriate, and that he would speak to Mr. Fine.

101.    But yet again, Mr. Fine's behavior did not improve; Mr. Fine continued to exclude Ms. Cacace from critical operations meetings, and he continued to speak to Ms. Cacace in a condescending manner when she was invited.

102.    In mid-August 2018, Ms. Cacace sought medical treatment for the anxiety and insomnia she experienced as a result of Mr. Fine's escalating mistreatment of her, and was prescribed anti-anxiety medication.

103.    On August 20, 2018, Ms. Cacace had her bi-weekly meeting with Mr. Fine, where at the end of the meeting Ms. Cacace expressed to Mr. Fine that she did not understand why he treated her so poorly, that she was a dedicated employee and was only trying to make their professional relationship work.

104.    Mr. Fine retorted that she was not trying, and that he "**can't say anything as a joke without it being reported**."

105.    Mr. Fine further acknowledged that he knew Ms. Cacace had reported his behavior – namely the offensive discriminatory comments.

106.    At this point, Mr. Fine told Ms. Cacace that he had hired another VP of Operations, Edward Hay, a white male, to work alongside her and that he would be starting September 4, 2018.

107.    Mr. Fine explained that he met Mr. Hay at an Advisor Board Conference and that he knew he was "**the guy**" he wanted there.

108.    Ms. Cacace asked Mr. Fine about the distribution of responsibilities between her and Mr. Hay.

109.    Mr. Fine responded, "I don't know, you keep doing what you think you should be doing, show Edward Hay everything you know and then we will figure it out."

110.    Based on this response, it is clear that Mr. Fine hired Mr. Hay to ultimately replace Ms. Cacace, and the ambiguity and uncertainty around her continuing job responsibilities caused Ms. Cacace increased anxiety.

111.    On September 4, 2018, Mr. Hay started at ProHEALTH and met with Ms. Cacace.  Mr. Hay also did not know what his responsibilities would be, and admitted that Mr. Fine told him to just learn everything that Ms. Cacace does.

112.    On September 6, 2018, ProHEALTH held an executive leadership meeting with Allscript, a vendor for an operations system that Ms. Cacace and her team had been building for the last two years.

113.    Instead of allowing Ms. Cacace to lead the meeting as she did previously, Mr. Fine took over and treated Ms. Cacace as if she was irrelevant to the meeting.

114.    In addition, questions concerning operations were initially directed to Mr. Hay, who then had to defer to Ms. Cacace because of his lack of knowledge.

115.    On September 11, 2018, Ms. Cacace received a text message from Mr. Fine that summoned her to a conference room.

116.    Mr. Fine was already in the conference room with Mr. Hay and two other employees when she arrived, and he immediately asked Ms. Cacace if she had the slides and data for that night's meeting.

117.    Confused about the request, Ms. Cacace explained that she was never asked to prepare slides or provide information for the meeting, and that Mr. Fine had scheduled the meeting without including her on the conversation about the agenda for the meeting.

118.    Mr. Fine proceeded to curse at and berate Ms. Cacace for a task that she was never told to do.  At the end of the meeting, Mr. Fine told Mr. Hay to work with "her" – pointing to Ms. Cacace.

119.    Ms. Cacace returned to her office, traumatized and humiliated by the incident.

120.    As Ms. Cacace prepared to send an email to request information to provide Mr. Hay, Ms. Cacace started to experience a panic attack and began to tremble.

121.    Ms. Cacace sought out Laurie Rosen, an employee relations administrator, who brought Ms. Cacace to a closed room.

122.    As Ms. Cacace began to explain what happened, the symptoms from her panic attack became more acute and she began developing chest pains and feeling breathless and dizzy.

123.    Ms. Rosen went to get Ms. Hallam and Ms. Schroeter, Chief Administrative Officer, who helped Ms. Cacace calm down, and then told her to return home for the afternoon.

124.    After a few hours, Ms. Cacace drove herself home, but had to stop twice on the interstate because she experienced chest pains.

125.    Once home, Ms. Cacace had to double the dosage of her anxiety medication to treat her symptoms.

126.    The following day, Ms. Cacace emailed Ms. Hallam to recount what happened and to inform her that she was still emotionally and physically traumatized by Mr. Fine's hostility and abuse, and was afraid to drive to work because of the continuing panic attacks.

127.    In response, Ms. Hallam placed Ms. Cacace on paid leave.

128.    On Tuesday, September 18, 2018, Ms. Cacace had a call with Ms. Hallam and Ms. Helling where she was offered a separation package, and told that if she were to take FMLA leave, it would be unpaid and that any separation offer would have to be delayed.

129.    The next day, Ms. Cacace emailed Ms. Hallam that the separation offer was unexpected, and that she was still taken aback that the Company's response to her complaints about Mr. Fine's behavior and retaliatory actions towards her had resulted in a separation offer, instead of his behavior being corrected.

130.    In response, Ms. Hallam claimed that it was Ms. Cacace who had requested a separation offer.

131.    However, that claim is false because Ms. Cacace had only commented to Ms. Hallam, in the middle of her panic attack, that if Mr. Fine really wanted her gone, why wouldn't he just fire her and offer her a separation package, rather than trying to force her to leave by unjustifiably attacking and verbally abusing her.

132.    Ms. Cacace has sought additional medical treatment and is currently being treated weekly for anxiety and depression, and took FMLA leave until December 5, 2018.

**Ms. Cacace is Terminated While on FMLA Leave**

133.    While Ms. Cacace was on FMLA leave, Mr. Fine took it upon himself to announce during a monthly Clinical Governance Committee meeting for the New York Proton Center ("NYPC") that Ms. Cacace was no longer working at ProHEALTH.

134.    The Clinical Governance Committee is attended by several high-level executives from the NYPC partners; Memorial Sloan-Kettering Cancer Center, Montefiore Medical Center, and Mount Sinai Health System.

135.    Mr. Fine's departure announcement, which came as a shock to members of the Clinical Governance Committee, and was false at the time because Ms. Cacace was still employed at ProHEALTH and on FMLA-protected leave.

136.    However, it was not long before Ms. Cacace was officially terminated.

137.    On November 28, 2018, Ms. Cacace received a letter from Corey Roberts, President of OPTUMCare, stating that her employment would be terminated effective December 5, 2018 because of unspecified "on-going changes."

138.    Upon information and belief, the Company hired a new Vice President of Operations while Ms. Cacace was on FMLA leave and terminated her employment so she would not be able to return to ProHEALTH.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Retaliation in Violation of the FMLA)**
***Against Defendants ProHEALTH and Dennis Fine***

139.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

140.    By the actions described above, among others, Defendants ProHEALTH and Dennis Fine have retaliated against Ms. Cacace for taking FMLA leave by making a public announcement that Ms. Cacace's employment with ProHEALTH had ended and thereafter terminating her employment.

141.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff will suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

142.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Discrimination and Harassment in Violation of the NYSHRL)**
***Against All Defendants***

143.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

144.    By the actions described above, among others, Defendants have discriminated, or aided and abetted the discrimination, against Plaintiff on the basis of her gender and/or sex in violation of the NYSHRL by denying her equal terms and conditions of employment, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and denying or taking away her job responsibilities and advancement opportunities.

145.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

146.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

147.    To the extent that any of the individual Defendants are not individually liable as Plaintiff's employer, the individual Defendants are liable under the NYSHRL because they aided and abetted the unlawful discrimination.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

148.    Plaintiff hereby repeats and re-alleges each and every allegation in all of the preceding paragraphs, as though fully set forth herein.

149.    Defendants retaliated against Plaintiff by, among other things, treating her in a derogatory and unprofessional manner, denying her promotion to COO and hiring a male employee with the intention to replace Ms. Cacace and terminating Plaintiff's employment.

150.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

151.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

152.    To the extent that any of the individual Defendants are not individually liable as Plaintiff's employer, the individual Defendants are liable under the NYSHRL because they aided and abetted the unlawful discrimination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.    An award of punitive damages in an amount to be determined at trial;

E.    Prejudgment interest on all amounts due;

F.    An award of Plaintiff's reasonable attorneys' fees and costs; and

G.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: December 3, 2018
        New York, New York                    Respectfully submitted,

                                              **WIGDOR LLP**

                                              By: _____
                                                  Jeanne M. Christensen
                                                  Bryan L. Arbeit

                                              85 Fifth Avenue
                                              New York, NY 10003
                                              Telephone: (212) 257-6800
                                              Facsimile: (212) 257-6845
                                              jchristensen@wigdorlaw.com
                                              barbeit@wigdorlaw.com

                                              *Counsel for Plaintiff*